Good morning, Richard Levy for DiNardo, who's the case that went to trial. There are no overlapping issues with the co-defendants, so we've agreed just to split our time, and I'll try hard to sit down after ten minutes. Turning straight to this Court's order regarding the Ramirez case, absolutely it's right on point. DiNardo's case is even stronger. In Ramirez, the one that came out a week ago, there were four sales within a period of a month of, quote, escalating quantities. Here, there is only a single attempted sale. The government conceded at ER 318, in rebuttal summation, DiNardo did not enter the conspiracy until April of 2008, and that he had nothing to do with the other Canadians in February, Blankhorn and Anderson. So this is just a single incident, and when you compare it to Ramirez, if Ramirez is insufficient for conspiracy, so is this. Ramirez is significant for a couple other reasons. The fact that the quantities involved were greater than for personal use is irrelevant, and that's Ramirez in the slip opinion on page 12. To prove conspiracy, the government had to show more than that Ramirez sold drugs to someone else, knowing that the buyer would later sell to others. So there's no dispute that with the amount anticipated here, five or ten kilograms, that the intent would be further distribution, but that's irrelevant. So the cases that seem to hint that Lennox is distinguishable because Lennox, that was the original Ninth Circuit case involving marijuana, because Lennox dealt only with a guy who grew his own and gave or sold little quantities to his friends for consumption, that that does not apply to a conspiracy where there's going to be further distribution. That's wrong under Ramirez. Can I ask you a quick question here? There's no question that under Ramirez you need some sort of an agreement, right? Right. Does this have to be a verbal agreement, or can it be an agreement implied by the circumstances? Certainly it can be an agreement implied by the circumstances, Judge Ezra. Okay. And then how do you fit that into the facts of this case? Why is that not present here? I don't necessarily disagree with you, but why is that not present here? Because there's the critical issue under Ramirez and the Seventh Circuit cases on which it relies is, is there a shared interest beyond the interest that any conscientious seller has with a buyer? So certainly if I call up my Trader Joe's and I arrange, make sure that they tell me when my favorite food comes in, that does not take it to the level beyond a buy-sell agreement because there's nothing, no shared interest beyond what any seller and buyer would have. So Ramirez talks about things like a kickback, evidence that there was a kickback, that there was selling on credit, shared stake in the buyer's illegal venture, some sort of profit sharing. Was there any evidence of any of those in this case? No, Judge Akuta. There was no evidence of any kickback, no evidence of any credit. In fact, the evidence was unanimous to the contrary. No way would these dealers give credit to some guy on a first-time sale that they don't even know. Well, they wanted to deposit, in fact, at one point, didn't they? They talked about- There was some issue about the bag left in the car and whether that was the deposit. The upstream guys among themselves, not with DiNardo, but among themselves, talked about maybe next time we'll ask them for a deposit, find out when he's coming, and then we can figure out what the deposit is. But even the deposit, first of all, as the brief discusses, that's just too nebulous. That's not even an agreement. That's just an agreement to explore, to negotiate. But even a deposit does not take it out of the realm of a buyer-seller agreement, turn it into a conspiracy. You pay a deposit, a layaway to a store, certainly you're not a conspirator. So your client was only charged with conspiracy here? Yes, and that's interesting because the other Canadians, for the other incident, were charged with both conspiracy and possession with intent to sell. I don't know why they didn't charge him with possession. They could have charged him with attempted possession. Yes, exactly. They could have, Judge Bates, and they didn't. I can't understand why they didn't charge him with possession because they had him clearly with possession here. Attempted possession. Attempted possession. I mean attempted possession, right. That's what I meant, attempted possession. Right, and that's a very interesting question. A large quantity of drugs. Right, right. So if there is no, if under Ramirez there's no conspiracy, then the rest of your issues just go away, right? That's it? I believe that the first issue on the quantity may have, insufficient evidence of quantity may have relevance for collateral estoppel purposes because I do not know what, if anything, the government will try to charge if there's insufficient evidence of a conspiracy. But we don't have to, we wouldn't have to resolve that, though. Yeah, because. Not required to, that's correct, Judge Bates. Everything else, the way I understand it, if there's insufficient evidence to convict him, you don't need to get to any other issue. Yes, yes. Everything falls away. Yes, I agree with that, Judge Bates. Okay. The other points that Ramirez is significant on is that just the fact that a conspiracy exists doesn't change the standard of proof for linking the defendant to the conspiracy. There's some perhaps unpublished cases saying, well, the question here isn't whether it's a conspiracy or a by cell. We know it's a conspiracy. We know there's a conspiracy. We're just asking whether defendant is in that. And I think the government makes that point on page 20 of their government brief. That is not the case. Even if there's an upstream conspiracy or another conspiracy, you still have to ask, is defendant's role by cell or conspiracy? That's the Thomas case, the Seventh Circuit case, that Ramirez cites. And it's significant that Ramirez cites and relies on the Seventh Circuit case, on Seventh Circuit authority, because that's the main authority discussed in the opening brief. And in effect, Ramirez is adopting that position, if it hadn't been made clear from the cases before. You might just want to touch on, for my benefit, the jury instruction issue. Yes. I guess the major impediment to my argument there is that his defense did not depend on it, because he was saying he had no involvement with drugs at all. It was contrary to it. I mean, he said, I was gambling. I had nothing to do with drugs. Right. And so I was trying to understand why the district court should... On its own. On its own, give an instruction contrary to his theory of defense. And the reason, Judge Akuta, is the first Thomas decision, at 150 F. Third, cited in the opening brief, dealt exactly with plain error for failure. That's the Seventh Circuit. There were two Thomas decisions. The first one dealt directly with plain error for failing to give a by-sell instruction, and reversed. And then it went to trial, and then it was reversed again for insufficient evidence of a conspiracy. But the touchstone there appeared to be that the evidence of a conspiracy was very slim. The court knew it was slim, and because of that, regardless of defendant's defense, the slimness of the evidence of conspiracy warranted the error under plain error. We don't actually know what the defense was from the opinion, but it's absolutely clear from the two Thomas opinions that it was overwhelming evidence that there was at least a by-sell agreement. This was the guy who sold to the woman in the housing project, who sold to other people in the housing project. On the first day, they got their checks. In essence, what you're suggesting, and you may be right, I don't know, that there should be some sort of kind of bright line here where district courts, in virtually every case where there's a conspiracy, and there's alleged conspiracy, and then there's a by-sell part of it, somebody's bought and sold drugs, which is virtually in every case, the district court has to give this instruction. I wouldn't go that far, Judge Ezra. Only where objectively the evidence is so thin on its face of a conspiracy, which I believe this case to be, especially in light of Ramirez, only then, regardless of defendant's defense, the error is plain. As Elvis said, it's... One of my concerns would be that what could very well happen is that even if the district court perceives the evidence as being thin, says, I insist I'm going to put this instruction in, and then defense counsel's going to say, wait a minute, you're sinking my ship, because this is not my defense. My defense is he had nothing. You put this instruction in there, and you're basically tainting the jury with this whole conspiracy thing, and my evidence is he's out gambling. He's going to the Indian Reservation. I would submit, Judge Ezra, that in that kind of circumstance, the judge under just under standard invited error doctrine, if the judge says I'm going to give this and defense says, please no, that's going to torpedo our case, and the judge acquiesces to that, then that error is invited and that can't be appealed. Okay. You were going to save half the time for your co-counsel over there.  Thank you. Good morning, Your Honors. Alisa Sawano-Peterson for Defendant Jaime Rios. Jaime Rios is appealing the application of the weapon possession enhancement under Guideline 2D1.1b1, and there is one point I want to address that was not fully discussed in the briefs.  It specifically referred to a weapon being possessed during the commission of the offense, and this was amended in 1991 to take out during the commission of the offense, and according to the commentary for the amendment, it was to clarify that the relevant conduct provisions for grouped offenses applied also to the weapon possession enhancement. And according to the relevant conduct provisions under 1B1.3a2, relevant conduct can include all acts that were part of the same course of conduct as the offense of conviction. And according to Application Note 9 for 1B1.3a2, offenses qualify as being part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate in determining this is whether the offenses are sufficiently connected or related to each other to be considered part of the same course of conduct, including the degree of similarity of the offenses, the regularity of the offenses, and the time interval between the offenses. And in Rios' case, there was a significant time interval. The last overt act in which Rios was involved was April 18, 2008, and the weapons were confiscated from his residence on December 1, 2010. So there was a time difference of almost two years and eight months. And the indictment alleges that the end date for the conspiracy was October 27, 2009, and that's over one year after that the weapons were found. And when you think about it, Mr. Rios was in a different residence when the weapons were found. It still seemed like he was in the same line of work. They found the cash, the guns, and a bunch of drugs, a pound of meth and seven ounces of coke. So why wasn't that enough for the district court to determine he was in the same line of work so it was connected to his prior efforts as a retailer, distributor? Well, because you have to think of it in terms of was this really part of the same crime spree? And what actually, when you look at it... Same course of conduct or common scheme. Yes, same course of conduct. 1.3. Right.  He was in a different residence, and even prior to that time he wasn't using his residence for distribution activities. And he said that the small amount of drugs, which is relatively speaking very small compared to the actual offense, had been there for over a year. And yes, there were cell phones found in his house, and there was money found in his house, but we don't know for how long he was storing those things. And it doesn't really show that there was actively some kind of ongoing distribution activity occurring at that time. It just shows that he had a lot of money in his house, and he had cell phones. And guns and drugs. And he had a small amount of drugs that he said that he had a year previous. But the court is entitled to rely, particularly in a sentencing proceeding, on circumstantial evidence, right? Yes. To take the client's word for it. That's true, Your Honor. But it's the defendant's position that this really is not enough to say that there is some kind of ongoing criminal conduct. And especially when you look at the large interval of time. And that is one of the factors that the sentencing guidelines says is important, is the interval of time. And here it was very great. And it's also the defendant's position that since the possession wasn't established, it's not his burden to say that it was highly improbable that the weapons possession was not connected to the offense. Because the possession of the weapons as part of this ongoing criminal activity was not established. And I have nothing further. I'd like to reserve some time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Clary O'Neill on behalf of the United States. I'll address first the DiNardo case and specifically jump to the issue of whether or not there was sufficient evidence of a conspiracy here, as opposed to a buyer-seller agreement. I think the question before this Court is whether the evidence introduced at trial established a conspiracy in the vein of United States versus Minkoff, for example. Or if it fell short, as it did in Lennox and the Court's recent opinion in Ramirez. And the government believes firmly that this case falls in line with Minkoff. And I'll discuss the facts of this case through Minkoff. But before I do that, I would like to touch on Ramirez. I just believe, the government believes, that Ramirez is factually distinct. The evidence that I can bring. It's pretty similar to me. Well, Your Honor, in Ramirez, the undercover agent purchased meth from Ramirez using co-defendant Bergeron as a go-between. And from the facts as presented in the opinion, co-defendant Bergeron could have been a gopher, for all we know. There was no discussion of what other additional facts were presented to the jury. And I have to assume, therefore, that they weren't. There was no discussion of whether or not there was evidence of mutual trust. And, in fact, I would put forth that there wasn't. Because for every one of those transactions, defendant Ramirez was watching nearby from a car or nearby restaurant. That's an indicia of a lack of mutual trust, which is a factor this Court looks to in determining if there's a conspiracy. There was lack of evidence, based on the way the opinion is written, from what I can glean, of a shared stake in the illegal venture. What was co-defendant Bergeron gaining, monetarily or otherwise, from these four discrete distributions? I was getting paid, right? I don't know, Your Honor. I mean, here, the thing that's troubling to me about this case is that they had set up this regular production, supplier, distributor, salesman. I mean, it just looks like any other type of sales arrangement. And there was none. I didn't see anything of, in Minkoff, the seller was fronting the person drugs. There was no commission. There was no stake in the venture. There was no personal participation. It was just he was the buyer, and the salesman came and took him out for a night on the town to make him wait so that they could make the sale.  So I'm really having trouble seeing how any of the indicia of conspiracy are present in this case. Yes, Your Honor. The government disagrees. And when you look at Minkoff, there were only two transactions at issue. There was a completed 2004 transaction, and there was a planned 2005 transaction. So, in fact, you don't need years and years of dealings. There is no magic number of transactions to prove a conspiracy. What is the indicia of conspiracy beyond a sale? Yes. So in your brief, and this is before Ramirez, but the brief is focusing on it was large sales, so everyone would have known that DiNardo was a retailer. He was going to go out and sell it to other people. I don't see how under our case law that's enough. There has to be some other indicia of conspiracy, and what is that here? Yes. The court is correct that the reasonable inference of further distribution based on the quantity is not sufficient. I don't think that's a fact we throw out, as defense counsel seemingly suggested. What we also have here is explicit knowledge of further distribution. And, again, alone, that would not be sufficient under this court's case law. But, again, that's not a fact we throw out, and that knowledge is evident from the wiretap calls at ER 341. There's no doubt. Let's just assume knowledge. I mean, when somebody buys, it's all tied up in the same fact. When somebody buys that quantity or seeks to buy that quantity, you reasonably infer that it's not for personal use and that he's a retailer. So let's just assume that. But that doesn't seem to be enough. There has to be some other factor that will nudge it into conspiracy. At least that's what Ramirez seems to say. Okay. And I think the other factors are shared stake in the illegal venture and then evidence. What is the shared stake? In other words, are they getting a commission? Are they getting a kickback? Are they getting a tip? All they're getting is these. It's a markup. A markup. But Minkoff and Webster. It's a sale, right? In any sale, you have a markup. That's correct. Then the Seventh Circuit. So you need to make a profit. That's correct. But I don't think conspiracies are immune to market capitalism. The Seventh Circuit seems to think so. But this court has said in Minkoff and Webster that just making the money off of each sale, the markup, that is evidence of a shared stake in the illegal venture. In Webster, there was a commission. I mean, that's how we got into the money laundering issue. Webster does have different facts. But the court did specifically refer to also just the markup on each sale. But I think here it was also reasonable for the jury to infer that the reason why Rios and Laris said on the wiretap calls, we don't want to lose this defendant, we don't want to lose this customer, is because as presented in the evidence, the sales to the Canadians were always large. This was a fast way, a big way for them to move product. And they knew it was going to be resold in Canada. So there is for them an incentive. They have a shared stake in continuing this illegal venture because it allows them not only to make money off of each sale, but also the size of the sale. How is that different than the shoe manufacturer wanting to keep their contract with Payless because they're a big client? I just don't see how that's any different. We don't say Payless is conspiring with shoe manufacturers. That was going to be my exact question. Well, the selling of shoes is illegal. But, I mean, here, Your Honor, we're not selling shoes. What they're selling is illegal and what they're agreeing to sell and redistribute. And the case law in this circuit is clear. You don't need an explicit express agreement. So the Rios and Lares need an agreement, but you need some indicia of something more than just a sale. That's how I read Ramirez. And what you're telling me is just totally consistent with the sales-buyer-seller relationship. So I'm just pressing to see is there anything that's not consistent with buyer-seller, where the seller has some sort of commission or kickback or gets money or has made an investment in the retail operation. Right. And, Your Honor, we don't have all of those specific facts. But what we do have at ER 395, when it's clear the deal is going south, and Rios says to Lares on the phone, if I had known the defendant was going to be coming to Los Angeles late, I would have put money down and made a deposit myself. That is indicia of his personal investment in keeping the scheme ongoing. Not the deposit that the government-claimed defendant later made, but he himself said at ER 395, if I had known exactly when he was coming, I would have put it down. And this is not in the briefs, but at ER 428, Lares paid for the defendant's hotel room. He said, I just paid $300. Why? Because they were trying to keep him here for the extra day. They are investing. They are facilitating the trip. They are willing to put down the deposit themselves. They paid for defendant's hotel room. We may not have specific indicia of fronting here. And in Minkoff, my reading of the case was that only happened once. But I don't think fronting is a requirement in order to find a conspiracy. And if it is, drug conspirators will just stop fronting and say, we weren't conspiring. So is it fair to look at other indicia of mutual trust? Indeed. So I think it's key at ER 395 that Rios, a broker one level above Lares, the shortest showing the larger scheme at play here, is willing to put down his own money. And, again, I think it is critical that it wasn't just a hospital. How do you reflect on the defendant? I don't understand your question, Your Honor. Well, I mean, there's no evidence here that DiNardo asked him to put up a deposit or to pay for the hotel room. But it's in – well, I – I don't quite get your – I don't see how this all comes back to – it's just like as Judge Ezra was saying, this is just, you know, good business operations, you know, taking him out to dinner, paying for his hotel. I mean, I don't see how that brings it full circle for you. Well, I don't think that the exclusive factors in terms of determining mutual trust have to be a kickback or a fronting. I think you have to look at how the conspiracy itself worked. And as Judge Ikuda was saying, what indicia was there of a personal investment? But was there any evidence that DiNardo was in – you know, asked them to pay for his room or to – No, there's no evidence in the record that I have that he specifically asked. To take him out on the drive around town and they went to Fat Burgers and a couple other places. No, Your Honor. There isn't evidence that defendant asked for that. Well, if he's charged with conspiracy, he has to have joined in the conspiracy, right? They don't just have to want him to be in the conspiracy. He has to have actively joined the conspiracy. Well, he actively joined the conspiracy when he left a deposit with them. I mean, if that is an indicia of mutual trust, I'm not sure what is because he's leaving his money with them for the next purchase. But you're right back to – this is the quandary you're in, I'm afraid. And Judge Ikuda and Judge Paez pointed it out beautifully, actually. This is just good business. So he leaves a deposit. Fine. So what? I mean, every business people leave deposits. There's no question that one group had a conspiracy. There's no group that maybe the Canadians were all conspiring amongst you. Maybe he was a bad conspiracy. But how do you link the two? I mean, there's no evidence that DiNardo said, hey, come on, help me out, you know, we're all in this together. I mean, there's none of that there. But, Your Honor, we're not going to have that specific evidence. I mean, they don't – Do you have it all the time? Believe me. The thing that troubles me is the money that the sellers get is just they make the sale. There's no evidence that the sellers are getting anything other than the sale of their drugs. And that's not enough, as I read Ramirez. So the other items where they're trying to give money to DiNardo, fund his trip, I think that's interesting. I'll have to think that through. But that doesn't mean that their operation grows if DiNardo's operation grows, other than the sale itself. Other than that he's a good customer, maybe he'll buy more. So in these other cases, if you get a percentage interest or if you front the money so that if he makes the sales you get payback, the issue seems to be, or the gist of the issue that Ramirez is looking at is the seller's stake increases if the buyer is successful. And that's what I'm missing here. Well, I understand the court's reluctance to accept the government's argument. But I don't think that this circuit should go down the path that the Seventh Circuit has. I think it is fair and it's a reasonable inference that members are working together to pursue the illegal goal of redistributing in Canada. And if the benefit is that they just sell a lot more in Canada, that is a sufficient benefit. So is Ramirez wrongly decided? Is that your view ultimately? My personal view, or speaking on behalf of the government, Your Honor, I don't think it was necessary to set forth the principles in Ramirez as they are set forth. But it's on the books. This panel is bound by it anyway. Exactly. It's on the books. But I don't actually think Ramirez changes to the government. It's not a game changer. It's just repeating what this court has said before in Lennox. It's repeating what this court said before in Minkoff. And in Minkoff, the court said we are looking for an agreement, an understanding that they are all procuring cocaine for the defendant's buyers in essence. And that's at Penn site 1193 through 94, working together for a common illegal goal. Wasn't the customer, didn't the customer have insufficient funds to buy the drugs and so the seller had to front the drugs? There was one incident of fronting. Yes, Your Honor, but just one. And there were only two transactions. And I already mentioned this before, but defendant is pushing this court to the Seventh Circuit, but in Lechuga in the Seventh Circuit, the court there said prolonged cooperation is neither the meaning of conspiracy nor an essential element. So the court may be looking for prolonged transactions, and that would be a favorable fact, but it's not a necessary requirement. And just on that point, and perhaps the court isn't as interested in it, but defendant pointed out that at ER 318, the government argued to the jury that this was the one and only transaction, if you will. That is contrary both to what was in the record at ER 394 and 395 when Rios asked Laris, is defendant only waiting one day this time? And then there was a reference to a time when defendant waited four or five days. And it's not in the excerpts of record, but at page 109 of document entry 197 on the district court docket, the government argued to the jury in opening close, this wasn't just one sale. There's other evidence in the record that he had been down before. So in terms of the number of transactions, I just wanted to clarify the evidence and the inferences that were argued to the jury. In terms of the failure of the district court to sua sponte instruct on the buyer-seller theory, the defendant is arguing essentially the district court plainly erred in failing to define a buyer-seller defense and then failing to sua sponte instruct on the defense. This court ---- Well, I think, yeah, but I, Ms. O'Neill, I think that what he's suggesting is that where the evidence of a conspiracy is weak. This is not, even under your rubric, this is not the strongest conspiracy case I've ever seen, that a district court under those circumstances does have an obligation to at least proffer to the parties that instruction. And if they say, look, that's not our theory, we don't want it, then they'd be hard-pressed to make an argument later under the invited error doctrine. Yes, I understand that argument, Your Honor. But I think the Seventh Circuit, and in the Seventh Circuit, the buyer-seller is a pattern instruction. It's not a pattern instruction in the Ninth Circuit. And in the United States ---- Yes. Is this thing consistent with SPAN, or can we read it consistently? In SPAN, the district court doesn't have an obligation to sua sponte, make an instruction that isn't requested. And so it wasn't clear to me whether the Seventh Circuit's rule was consistent with that. Well, I believe it's at least consistent with the Ninth Circuit in United States v. Montgomery, where a defendant doesn't offer a particular instruction and doesn't rely on that theory of defense. I mean, the defendant here said, I was completely innocent, I'm a gambler. And then in closing argument, his attorney said, he was completely innocent, he was a gambler. And if you believe the government's story, well, the deposit story doesn't make any sense. He didn't have enough money on him. He never once said, this was just transaction by transaction, buyer-seller. It wasn't the theory of the defense. And in Montgomery, this Court held that the district court's failure to offer an instruction sua sponte in those circumstances just doesn't rise to the level of plain error. Would the Court like me to address the quantity or the safety valve issue, or should I move on to Rios? All right. You can turn to Rios. Okay. Thank you, Your Honor. So in Rios, the defendant is appealing the application of the two-level weapons possession enhancement at 2D1.1b1. It's the government's position this is a straightforward enhancement, and this Court's precedent and the facts of this case support its application here. When officers arrested the defendant in December 2010, as the Court has already pointed out, they found three loaded guns, along with clear indicia of continuing drug activity, the pound of methamphetamine, seven ounces of cocaine, six cell phones, and over $60,000 in cash. Thus, the enhancement was properly applied because the guns were possessed during a period of time the defendant was involved in the drug trade, as the district court found as a matter of fact. It was defendant's burden in the district court to show the possession was clearly unconnected to the offense, and it's his burden now to show that the district court clearly erred. It's the government's position that he did not do the first and cannot do the second now. The Court is aware of sort of the core principles supporting the application of the enhancement, that this Court looks to relevant conduct, not just the offense of conviction. It doesn't require, under Stewart and Willard and Pitts, even physical proximity between where the offense occurred and where the weapon possession or where the weapon was found. In fact, in Stewart, the Court, it was a conspiracy charge, and the Court said the conspiracy has no definitive location. And moreover, this Court, previously in both Pitts and Willard, has applied the enhancement, both when there's a lack of physical proximity and a temporal separation between the offense of conviction and the possession. So here, given the facts of what was found at the time that defendant was arrested, and given the district court's clear factual holding that the defendant, and this is at ER 12 and 22, that the defendant was involved in the drug trade, that this possession of all these items evidenced his serious involvement in the drug trade, that the enhancement was not erroneously applied. Does the Court have additional questions? Okay. Well, with that, Your Honors, the government will submit. Thank you. Thank you, counsel. Good morning again. Just a couple points on the government's theory of the case. It couldn't be any clearer than the beginning of rebuttal summation ER 318. Certainly, the government is not arguing that defendant DiNardo was connected to Anderson and Blankhorn, the other Canadians in February, in the February 2008 seizure. He entered the conspiracy in April of 2008. Nothing could be clearer. When the phone taps refer to this time or other times, we have to remember they're dealing with a lot of Canadians, and they refer indiscriminately to the Canadians. So whether he's referring to this particular Canadian or another is a matter of speculation, and given the government's theory at trial, he entered the conspiracy in April of 2008. That's conclusive against the government from trying to speculate that these other cryptic comments refer specifically to him. I agree entirely with Judge Akuta. You need the indicia of something more than a sale. And as Judge Paya's questions indicated, you wine and dine customers all the time. Even if you paid the hotel bill, you do that for customers, and there's no evidence anyway that DiNardo asked him for that. And in addition, he said $300 for the hotel bill. I don't believe that refers to DiNardo's hotel bill, because the invoices show he paid $70 a night for three nights, $210. It's important to remember that these phone calls... If you raided the minibar, who knows? That could be. That would be two Cokes, two Coca-Colas probably. But it's important to remember that these calls, they're talking about all... This is a running operation. I mean, there's no question Sandoval and Rios had a wide-ranging operation. Just because they make a reference on a particular phone call to something doesn't mean it's referring to DiNardo or that there's evidence it refers to DiNardo. You know, counsel, for me, and I don't think this is a big secret to you, because I think you mentioned it early on, the biggest problem I'm having here with your argument, I think what you've said makes some sense. But the big problem I'm having is with the fact, and I think Ms. O'Neill pointed this out, she did a terrific job, I think, in arguing her case under difficult facts. Your client, I understand you weren't trial counsel, but your client took a completely inconsistent defense, and we have a problem here because there is law that says that a judge is not required to give sua sponte instruction that would negate somebody's theory of defense. And, in fact, that's somewhat reversible error in many instances. That's true in general, Judge Ezra. I can see that the Montgomery case that counsel cited states that. However, the Anderson case that I cited on page 71 of the opening brief departs a little bit from that, where the court found plain error even where defendant didn't overtly rely on the defense, where there was no strategic reason why he would relinquish it. And here, why would he relinquish it? I mean, we have that kind of defense all the time. I wasn't the guy who stabbed the guy in the alley, but whoever stabbed him did it in self-defense. I mean, there's no impediment to having that fallback position. Well, you know, your client's argument isn't, gee, you know, I was going to buy some drugs, but I didn't buy these drugs, or I wasn't in a conspiracy against people, it was just a buy. His argument was drugs? I don't know anything about drugs. I'm a gambler. Right, right. Yes, I recognize that, Judge Ezra. Okay, my time's up. Thank you. Counsel, do you have anything? I'll give you a minute. I just wanted to emphasize that the cases that the government cited did not deal with this level of time interval between the offense and the possession of the guns. And also, the proximity of the guns to drug activity is not dispositive, but it is circumstantial evidence in regards to whether it was possessed during the commission of the offense. And also, in terms of burden, the government needs to establish that the weapons were present. And after the government establishes that, then it becomes the defendant's burden to show that it was clearly improbable that the weapons were connected with the offense. Okay. Thank you, Your Honor. Thank you, Counsel. We appreciate your arguments in this interesting case. The matter is submitted at this time.
judges: Ezra, Paez, Ikuta